UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE MDL 1720 DAMAGES CLASS SETTLEMENT DISPUTES | 1:24-mc-03415-BMC-JAM |
| IN RE MDL 1720 DAMAGES CLASS SETTLEMENT DISPUTE CONFLICT ID NUMBERS: 261129 (BUFFETS LEASING CO. LLC), 261130 (HOMETOWN LEASING CO. LLC), 261136 (HOMETOWN BUFFET, INC.), 261137 (OCB LEASING CO. LLC), 261139 (BUFFETS FRANCHISE HOLDINGS, LLC), 261141 (RYAN'S REST. MGMT. GRP., LLC), 261143 (OCB PURCHASING CO.), 261144 (DISTINCTIVE DINING, INC.), 261147 (FIRE MTN. LEASING CO., LLC), 261148 (FIRE MTN. MGMT. GRP., LLC), 261149 (BUFFETS HOLDINGS, INC.), 261150 (TAHOE JOE'S LEASING CO. INC.), 261151 (BIG R PROCUREMENT CO., LLC), 261152 (BUFFETS REST. HOLDINGS, INC.), 261153 (RYAN'S REST. LEASING CO. LLC), 261199 (RYAN'S REST. GRP., LLC), 261263 (TAHOE JOE'S, INC.), 261290 (OCB REST. CO., INC.), 261307 (FIRE MTN. RESTAURANTS LLC), and 261449 (BUFFETS, INC.). | 1:26-mc-02391-BMC-JAM <br><br> **ORAL ARGUMENT REQUESTED** <br><br> Re: ECF #2 |

## OBJECTION OF CLAIMANT OAK POINT PARTNERS, LLC
## TO REPORT AND RECOMMENDATION

Avery Samet
Jeffrey Chubak
John W. Brewer
Amini LLC
131 West 35th Street
12th Floor
New York, NY 10001
(212) 490-4700
asamet@aminillc.com
jchubak@aminillc.com
jbrewer@aminillc.com
Attorneys for Claimant Oak Point Partners, LLC

**TABLE OF CONTENTS**

|  | Page |
|---|---|
| TABLE OF AUTHORITIES | ii |
| INTRODUCTION | 1 |
| LEGAL STANDARD | 3 |
| BACKGROUND | 3 |
| I. 2012 BANKRUPTCY & COMPETING ASSET SALES | 3 |
|     A. The 2012 Plan | 3 |
|     B. The Cascade APA | 4 |
|     C. The Litigation Trust's Remnant Asset Sale to Oak Point Partners | 7 |
| II. 2016 BANKRUPTCY & REMNANT ASSET SALE TO OAK POINT PARTNERS | 8 |
|     A. The 2016 Bankruptcy | 8 |
|     B. The Unsecured Creditors Trust's Remnant Asset Sale to Oak Point Partners | 9 |
| III. 2021 BANKRUPTCY & RESIDUAL ASSET SALE TO OAK POINT PARTNERS | 9 |
|     A. The 2021 Bankruptcy | 9 |
|     B. The Liquidating Trust's Residual Asset Sale to Oak Point Partners | 11 |
| ARGUMENT | 11 |
| I. THE 2012 DEBTORS' *MDL 1720* DAMAGES CLAIMS WERE TRANSFERRED TO THE LITIGATION TRUST | 11 |
| II. EVEN HAD *MDL 1720 DAMAGES* CLAIMS VESTED IN THE REORGANIZED 2012 DEBTORS, NOT ALL CLAIMS WERE SOLD TO CASCADE | 12 |
|     A. The Cascade Sale Did Not Include *MDL 1720* Damages Claims of Any Entity Other than Buffets Inc. | 12 |
|     B. The Cascade Sale Did Not Include *MDL 1720* Damages Claims of Buffets Inc. that Accrued after the Commencement of its 2016 Bankruptcy | 14 |
| III. THE OAK POINT PARTNERS AGREEMENTS EFFECTUATED TRANSFER OF THE POST-CONFIRMATION TRUSTS' *MDL 1720* DAMAGES CLAIMS TO IT | 16 |
| IV. ALTERNATIVELY, THE MATTER SHOULD BE RESUBMITTED WITH INSTRUCTIONS TO PERMIT DISCOVERY ON THE DOCUMENT ATTACHED TO THE SIGNED DATA AUTHORIZATION | 18 |
| CONCLUSION | 18 |

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Advanced Video Technologies, LLC v. HTC Corp.*,
103 F. Supp. 3d 409 (S.D.N.Y. 2015) ................................................................. 13

*In re Atlantic Gulf Communities Corp.*,
326 B.R. 294 (Bankr. D. Del. 2005) .................................................................... 17

*De La Vergne Refrigerating Mach. Co. v. German Sav. Inst.*,
175 U.S. 40 (1899) ............................................................................................... 13

*Dole Food Co. v. Patrickson*,
538 U.S. 468 (2003) ....................................................................................... 12, 13

*In re Fitzgerald*,
428 B.R. 872 (B.A.P. 9th Cir. 2010) ................................................................... 12

*In re G-I Holdings, Inc.*,
580 B.R. 388 (Bankr. D. N.J. 2018) .................................................................... 15

*Goldstein v. Consol. Edison Co. of New York*,
115 A.D.2d 34 (1st Dept 1986) ........................................................................... 13

*In re Grubb & Ellis Co.*,
2012 WL 1036071 (Bankr. S.D.N.Y. Mar. 27, 2012) ......................................... 15

*In re Lacy*,
183 B.R. 890 (Bankr. D. Colo. 1995) .................................................................. 15

*In re Mid-Island Hospital, Inc.*,
276 F.3d 123 (2d Cir. 2002) ................................................................................ 15

*Mission Prod. Holdings, Inc. v. Tempnology, LLC*,
587 U.S. 370 (2019) ............................................................................................ 15

*In re Moore*,
608 F.3d 253 (5th Cir. 2010) ......................................................................... 11, 12

*Oak Point Partners, LLC v. Blue Cross Blue Shield of Michigan*,
446 F. Supp. 3d 195 (E.D. Mich. 2020) .............................................................. 17

*In re Pursuit Capital Management, LLC*,
2016 WL 5402735 (D. Del. 2016) ....................................................................... 12

*In re Pursuit Capital Management, LLC*,
874 F.3d 124 (3d Cir. 2017) ................................................................................ 12

*U.S. v. Banyan*,
   933 F.3d 548 (6th Cir. 2019) .......................................................................... 13

*U.S. v. Bennett*,
   621 F.3d 1131 (9th Cir. 2010) ........................................................................ 13

*U.S. v. Wallach*,
   935 F.2d 445 (2d Cir. 1991) ............................................................................ 13

*In re Woldeyohannes*,
   665 B.R. 543 (Bankr. D. Conn. 2024) .............................................................. 17

*In re Woldeyohannes*,
   2025 WL 1696209 (D. Conn. June 17, 2025) ................................................... 17

*In re Wright*,
   545 B.R. 541 (Bankr. S.D. Tex. 2016) ........................................................ 14, 15

**Statutes and Rules**

11 U.S.C. § 101 ................................................................................................. 8, 10

11 U.S.C. § 363 ........................................................................................... 11, 12, 16

11 U.S.C. § 510 ...................................................................................................... 4

11 U.S.C. § 541 ........................................................................................... 10, 14, 15

11 U.S.C. § 542 ............................................................................................ 4, 11, 16

11 U.S.C. § 543 ...................................................................................................... 4

11 U.S.C. § 544 ...................................................................................................... 4

11 U.S.C. § 545 ...................................................................................................... 4

11 U.S.C. § 547 ...................................................................................................... 4

11 U.S.C. § 548 ...................................................................................................... 4

11 U.S.C. § 550 ...................................................................................................... 4

11 U.S.C. § 551 ...................................................................................................... 4

11 U.S.C. § 1101 ............................................................................................... 14, 15

11 U.S.C. § 1107 ........................................................................................... 11, 14, 15

11 U.S.C. § 1123 ........................................................................................... 10, 11, 16

11 U.S.C. § 1141 ........................................................................................................ 4, 10

Fed. R. Civ. P. 53 ....................................................................................................... 1, 3, 18

Fed. R. Civ. P. 56 ........................................................................................................... 18

Fed. R. Evid. 201 ............................................................................................................. 4

**Other Authorities**

1 Fletcher Cyc. Corp. § 31, "Distinctness of corporate entity—Property, titles, transfers and conveyances" ........................................................................................... 13

18A Am. Jur. 2d Corporations § 625, "Interest in corporate property—Corporations as stockholder; parent and subsidiary" .......................................................... 13

Rev. Proc. 94-45, 1994 WL 322710 ............................................................................... 9

,

Claimant Oak Point Partners, LLC ("OPP") objects to the Special Master's report and recommendation (ECF #2, "R&R") and states:

**<u>INTRODUCTION</u>**

This is a dispute over the extent to which *MDL 1720* settlement proceeds associated with Conflicts IDs listed in the caption belong to Blue Sturgeon Holdings LLC ("BSH") as transferee of Cascade Settlement Services LLC ("Cascade"), on the one hand, or OPP and Claims Compensation Bureau, Inc. ("CCB"), the claims servicer and authorized representative of Park Interchange, LLC which took certain *MDL 1720* damages claims (indirectly) from OPP. (R&R at 4 n.3.)

The dispute turns on the consequence of several prior transactions, the terms of their governing documents and application of bankruptcy law, nearly all of the entities in whose favor the *MDL 1720* damages claims originally arose (referred to as the "Buffets Entities" in R&R at 3) having gone through bankruptcy, in some cases several times. This Court referred the dispute to the Special Master to make a report and recommendation, subject under FRCP 53 to this Court's de novo review.

The claimed chain of title of OPP and CCB is based on:

- The 2016 purchase of all "Remnant Assets" from the "Litigation Trust" established in 2012 under the Chapter 11 plan of reorganization of Buffets Inc. and fifteen affiliates (together, the "2012 Debtors"),

- The 2022 purchase of all "Remnant Assets" from the "Unsecured Creditors Trust" established in 2017 under the Chapter 11 plan of reorganization of Buffets LLC fka Buffets Inc. and six affiliates (together, the "2016 Debtors") and

1

- The 2022 purchase of all "Residual Assets" from the "Liquidating Trust" established in 2021 under the Chapter 11 plan of liquidation of Buffets LLC and fourteen of its affiliates (together, the "2021 Debtors", and together with the 2012 and 2016 Debtors, the "Buffets Debtors").[1]

BSH's claimed chain of title is based on a 2013 Asset Purchase Agreement ("APA") between Cascade and Buffets Inc., but none of its affiliates, which purported to transfer Buffets Inc.'s *MDL 1720* damages claim to Cascade.

In recommending the bottom-line conclusion that BSH's claimed chain of title is superior to that of OPP and CCB, the Special Master made the following errors of law that this Court should decline to adopt:

- The Special Master incorrectly concluded that the *MDL 1720* damages claims of the 2012 Debtors were not previously transferred to the Litigation Trust, which then sold them to OPP. That was wrong.

- He treated the Cascade APA as giving Cascade not only the *MDL 1720* damages claims of Buffets Inc. itself but of all of its affiliates, even though the agreement did not purport to transfer the claims of affiliates and Buffets Inc. lacked legal capacity to transfer such claims. That was wrong.

---

[1] Attached as Exhibit A is a chart identifying the 2012, 2016 and 2021 Debtors by their respective Conflicts IDs.

Attached as Exhibit B is a chart identifying Conflicts ID of four other entities that did not file bankruptcy cases but were each a predecessor to a 2012 Debtor, as described therein. Accordingly, ownership of the four entities' share of settlement proceeds turns on ownership of the *MDL 1720* damages claims of those 2012 Debtors.

- He treated the Cascade APA as giving Cascade the *MDL 1720* damages claims of the 2016 Debtors and the 2021 Debtors that had not even accrued yet and which belonged to their separate bankruptcy estates, which was legally impossible for it to do and not permitted under bankruptcy law. That was wrong.

This Court should decline to adopt the Special Master's erroneous conclusions and should instead conclude that the only *MDL 1720* damages claims Cascade purchased were those of Buffets Inc. that accrued between its emergence from bankruptcy in 2012 and the commencement of its next case in 2016. All other *MDL 1720* settlement proceeds allocable to Buffets Inc. and all settlement proceeds allocable to the other Buffets Entities belong to OPP or its transferees.

## LEGAL STANDARD

The Special Master's findings and conclusions are subject to de novo review. FRCP 53(f); *In re MDL 1720 Damages Class Settlement Disputes*, 24-mc-03415 (E.D.N.Y.) (ECF #3, "Revised Special Master Order"). In addition, pursuant to FRCP 53(f), the Court "may receive evidence; and may adopt or affirm, modify, wholly or partly reject or reverse, or resubmit to the master with instructions".

## BACKGROUND

I.    **2012 BANKRUPTCY & COMPETING ASSET SALES**

A.    **The 2012 Plan**

The 2012 Debtors filed Chapter 11 cases on January 18, 2012. (R&R at 6.)

3

Their Chapter 11 plan of reorganization (2012 Bankr. ECF #743-1, the "2012 Plan"[2]) was confirmed June 27, 2012 (2012 Bankr. ECF #743) and became effective (2012 Bankr. ECF #806) on July 18, 2012.

It effectuated an exchange of secured debt for equity (2012 Plan Article IV.B) and established a Litigation Trust (2012 Plan Article IV.E) for the benefit of unsecured creditors. The trust was settled with cash and "Transferred Avoidance Actions" (2012 Plan Article VII.D.2), defined as "all Avoidance Actions, other than the Excluded Actions", with "Avoidance Actions" defined as "those claims or causes of action of the Estates arising out of or maintainable pursuant to sections 510, 542, 543, 544, 545, 547, 548, 550 or 551 of the Bankruptcy Code or under any other similar applicable law, regardless of whether or not such action has been commenced prior to the Effective Date" (emphasis added).

Upon the plan's effective date, the Transferred Avoidance Actions were transferred to the Litigation Trust (2012 Plan Article VII.D.2), with all other property of each 2012 Debtor's estate vesting (2012 Plan Article V.D, 11 U.S.C. § 1141(b)) in the respective reorganized debtor.

## B.     The Cascade APA

In 2013, Cascade entered into an APA with Buffets Inc. only (Chubak Decl. Exhibit 1) pursuant to which Buffets Inc. purported to have conveyed an "Asset", defined as the monetary recovery in *MDL 1720* (if any) to which "Seller", defined as Buffets Inc., may be entitled.

---

[2] The Court may take judicial notice of bankruptcy court filings (hyperlinked) pursuant to FRE 201. *E.g. Yencho v. Chase Home Fin. LLC*, 2015 WL 127721, at *1 n.1 (S.D.N.Y. Jan. 8, 2015) (citing *Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000)) (court filings are "quintessential materials of which the Court may take judicial notice"). Out of an abundance of caution, such documents are attached to the accompanying declaration of Jeffrey Chubak ("Chubak Decl."). Substantially all such documents were previously provided to the Special Master. In accordance with Revised Special Master Order ¶4, submissions to the Special Master will be submitted under cover of a supplemental declaration.

(Cascade APA ¶A, ¶2.2(a).)  The transaction is purported to have closed on July 13, 2013. (Cascade APA ¶2.2(a).)

By the Cascade APA, Buffets Inc. agreed to execute and deliver a "Notice of Assignment, in the form attached hereto as Exhibit A" and an "Authorization to Obtain Transactional Data, in the form attached hereto as Exhibit B".  (Cascade APA § 2.2(b).)  The Cascade APA did not include a form of notice or authorization.  Rather, the copy provided to OPP (see R&R at 8) included a one-page notice (to the *MDL 1720* claims administrator) signed by Buffets Inc.'s Vice President of Finance Paul Holovnia (the "Signed Notice") providing:

> This Notice of Assignment transfers and assigns to **CASCADE** … ("Purchaser") all of **BUFFETS, INC.'s** ("Company") right, title and interest in and to … any recover arising from the class action litigation of In re: Payment Card Interchange Fee and Merchant-Discount Antitrust Litigation (Case No. …) (the "Recovery").
>
> The rights assigned to Purchaser include … the Company's right to file a claim … The Company has provided Purchaser with merchant identification information listed on and attached hereto as Schedule A, Schedule B and Schedule C.
>
> Purchaser is now the legal and equitable owner of all rights associated with any Recovery.

No Schedule A, Schedule B or Schedule C is attached to the Signed Notice.  Instead, what follows it is a one-page computer-generated PDF, in contrast to the Signed Notice and Cascade APA signature pages which are scanned PDFs, that is a "List of Buffets, Inc.'s subsidiaries and affiliates as of November 2023 per the Asset Purchase Agreement dated 7/2/2013", and beneath it is a chart listing 21 entities (apart from Buffets Inc.) and their TINs stating the "Account Name" for each is Buffets Inc.,[3] despite the Cascade APA itself not referring to any subsidiary(ies) or

---

[3] 25 are listed including Buffets Inc. but three are listed twice: OCB Restaurant Company (-7607) and Ryan's Restaurant Group (-7895) and Fire Mountain Restaurants (-8003).

affiliate(s).  As a document listing affiliates "as of November 2023" it clearly was not part of the original APA from 2013.

On May 15, 2026, after the completion of briefing, BSH submitted a three-page document that it claimed was the Authorization to Obtain Transactional Data from the 2013 APA and that had been inadvertently omitted from the prior submission.  (Chubak Decl. Exhibit 3.)  Pursuant to the document, signed by Mr. Holovnia on behalf of Buffets Inc. and also by Cascade (Chubak Decl. Exhibit 2, "Signed Data Authorization"), Buffets Inc. purportedly "authorize[d] Cascade to request … all of Client's [defined as Buffets Inc.] Transactional Data, including but not limited to the merchant identification information listed on and attached hereto as Schedule A, Schedule B and Schedule C."

As with the Signed Notice attached to the Cascade APA, the Signed Data Authorization attaches two pages of unsigned, computer-generated PDFs (in contrast to the Signed Data Authorization which is a scanned PDF, like the Cascade APA signature pages and Signed Notice).  Those pages are wider than the scanned PDF preceding them, indicating they were not part of the original document.[4]  Of those two pages, the first is a purported Schedule B (there is no Schedule A) that is a chart purporting to list "affiliated corporate names … and tax IDs (EINs) that comprise the company listed in the notice of assignment" and which lists Buffets Inc. and 19 other entities, so two fewer than the PDF attached to the Signed Notice.[5]

---

[4] When multiple PDFs are combined the resulting document retains the unique dimensions of its original source files, unless "scaled" to a uniform size which did not occur here.

[5] The entities included in the page attached to the Signed Notice that are omitted from Schedule B attached to the Signed Data Authorization are HRE Mountain Management Group, LLC (-7299) and Rijffets, Inc. (-2294).

6

Based only on the purported Schedule B that follows the Signed Data Authorization, the Special Master concluded (R&R at 8-9) that by the Cascade APA, Buffets Inc. sold not only its own *MDL 1720* damages claims, but also *MDL 1720* damages that had not yet accrued and which belonged to its future bankruptcy estates and future reorganized self and the *MDL 1720* damages claims of its corporate parents and subsidiaries. Despite declining to credit the computer-generated PDF that followed the Signed Notice based on the November 2023 reference (R&R at 9), and the similarities between that document and the computer-generated, unsigned Schedule B, no questions were raised about Schedule B and its authenticity was apparently accepted by the Special Master.

Pursuant to an APA dated July 3, 2013, the day after the Cascade transaction purported to have closed, "Cascade transferred to BSH the Asset it had just purchased from Buffets, Inc." (R&R at 9.)

### C.    The Litigation Trust's Remnant Asset Sale to Oak Point Partners

"On September 30, 2016, OPP entered into an APA with the Litigation Trust" (Chubak Decl. Exhibit 4, cited in the R&R as "OPP APA 1"), under which the trust sold all of its Remnant Assets to OPP. (R&R at 13.)

"Remnant Assets" are defined as "property of the Trust remaining" "at the time of the execution of this Agreement and continuing into the future" "consisting of known or unknown assets or claims which have not been previously sold, assigned or transferred" including "any and all claims, benefits, interests and causes of action, and rights to payment of the Debtors or the Trust against American Express or any of its affiliates" (defined as the "AmEx Claims"), but excluding cash on hand at the time of the agreement. (OPP APA 1 at 1.)

The Special Master concluded Remnant Assets transferred to the Litigation Trust pursuant to this agreement did not include *MDL 1720* damages claims on the ground that such claims are not "Avoidance Actions". (R&R at 20.)

## II.    2016 BANKRUPTCY & REMNANT ASSET SALE TO OAK POINT PARTNERS

### A.    The 2016 Bankruptcy

The 2016 Debtors filed bankruptcy cases on March 16, 2016.  (R&R at 11; Exhibit A.)

Their Chapter 11 plan of reorganization (2016 Bankr. ECF #2573, "2016 Plan") was confirmed on April 27, 2016 (2016 Bankr. ECF #2576, "2016 Order") and became effective (2016 Bankr. ECF #2630) on May 18, 2017.

It established an Unsecured Creditors Trust (2016 Plan Article IV.D-E & VII.B) for the benefit of unsecured creditors.  The trust was settled (2016 Plan Article VII.D.2) with "Trust Assets", defined to include all "Causes of Action" of the estates of the 2016 Debtors, which in turn is defined to include all "claims" and "causes of action" owned by them as of the plan effective date, excluding released or excluded claims.  "Claims" in turn is defined by reference to 11 U.S.C. § 101(5), which defines the term to include any "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, undisputed, legal, equitable, secured or unsecured". The plan supplement (2016 Bankr. ECF #2661), whose exhibits were approved at confirmation (2016 Order ¶N, ¶51) further identifies causes of action assigned to the trust (2016 Bankr. ECF #2661-5) as encompassing virtually all those belonging to any of the 2016 Debtors.  The plan supplement also includes a "Schedule of Causes of Action Excluded from Trust Causes of Action" (2016 Bankr. ECF #2661-11) that does not mention *MDL 1720* damages claims.

Upon the plan's effective date, the "Trust Assets" were transferred to the Unsecured Creditors Trust (2016 Plan Article VII.D.2) with all other property of each 2016 Debtor's estate vesting (2016 Plan Article VIII.D, 2016 Order ¶34) in the respective debtor.

**B.    The Unsecured Creditors Trust's Remnant Asset Sale to Oak Point Partners**

"On March 29, 2022, OPA [sic, should be OPP] entered into an APA with the Unsecured Creditors' Trust" (Chubak Decl. Exhibit 5, cited in the R&R as "OPP APA 3"), under which the trust sold all of its Remnant Assets to OPP.  (R&R at 14.)

"Remnant Assets" are defined as "property of [the] Trust remaining" "at the time of execution of this Agreement [around five years after the trust's formation on the effective date[6]] and continuing into the future" "consisting of known or unknown assets or claims which have not been previously sold, assigned or transferred", "including without limitation, all cash, securities, instruments and other property that may be paid or issued" in conjunction with same and "any payments received by Seller" on account of same, but excluding cash on hand at the time of the agreement.  (OPP APA 3 at 1, ¶2, ¶7.)

**III.    2021 BANKRUPTCY & RESIDUAL ASSET SALE TO OAK POINT PARTNERS**

**A.    The 2021 Bankruptcy**

The 2021 Debtors filed bankruptcy cases on April 20, 2021.  (R&R at 12; Exhibit A.)

---

[6] Post-confirmation trusts such as the Unsecured Creditors Trust are only supposed to exist for five years (Rev. Proc. 94-45, 1994 WL 322710, at *2 (§ 3 Condition .06)), to retain favorable grantor trust tax treatment.  Consistent with this the Unsecured Creditors Trust Agreement included in the plan supplement required (2016 Bankr. ECF #2661-3 § 10.2) trust dissolution within five years following the effective date unless the trustee and trust advisory board agree to an extension or the Bankruptcy Court grants an extension.

Their Chapter 11 plan of liquidation (2021 Bankr. ECF #498, "2021 Plan") was confirmed on December 20, 2021 (2021 Bankr. ECF #586, "2021 Order") and became effective (2021 Bankr. ECF #589) on the same date.

Unlike the prior (reorganization) plans, the 2021 Plan was a liquidating plan under which all estate property was transferred to a Liquidating Trust for distribution to creditors.  (2021 Plan Article IV.A, IX.A.)  "Liquidating Trust Assets", i.e. those assets with which the Liquidating Trust was settled, is defined (2021 Plan Article II.B.55) as "all of the Debtors' Assets transferred to the Liquidating Trust", with "Assets" defined (2021 Plan Article II.B.7) broadly by reference to 11 U.S.C. § 541 and specifically including "all existing or potential claims and Causes of Action, whether previously identified, noticed, brought/filed or otherwise, including without limitation all rights and entitlements to the return of previously transferred or sold assets without authority." The term "Causes of Action" is broadly defined (2021 Plan Article II.B.16) as "all actions … causes of action, suits … rights to legal remedies … rights to payment and claims (as defined in Bankruptcy Code § 101(5)) … includ[ing] Litigation Claims", defined (2021 Plan Article II.B.52) as "all of the Debtors' and the Estates' rights, claims … Causes of Action … judgments … damages and demands whatsoever in law or in equity."  The plan did not provide for any estate property to be transferred to any other party under 11 U.S.C. § 1123(a)(5)(B), or vest in any other entity pursuant to 11 U.S.C. § 1141(b).  Thus, all *MDL 1720* damages claims constituting estate property necessarily constituted a Liquidating Trust Asset.[7]

---

[7] To the extent *MDL 1720* damages claims constituting estate property in the 2016 bankruptcy somehow were not transferred to the Unsecured Creditors Trust, those claims revested in the respective reorganized debtors upon the effective date, became estate property in the 2021 bankruptcy and were then assigned to the Liquidating Trust.

**B.**      **The Liquidating Trust's Residual Asset Sale to Oak Point Partners**

"On March 22, 2022, OPA [sic] entered into an APA with the Liquidating Trust" (Chubak Decl. Exhibit 6, cited in the R&R as "OPP APA 2") under the trust sold all of its Residual Assets to OPP. (R&R at 14.)

"Residual Assets" are defined as "property of the Debtors" that vested in the trust "at the time of the execution of this Agreement and continuing into the future" "consisting of known or unknown assets or claims which have not been previously sold, assigned, transferred limited to the following … claims or proceeds of claims in settlement of class action or antitrust matters", but excluding cash on hand at the time of the agreement. (OPP APA 2 at 1.) Thus, Residual Assets naturally includes *MDL 1720* damages claims. Indeed, the Cascade APA describes the *MDL 1720* litigation as an antitrust class action that may result in settlement.

## ARGUMENT

**I.**      **THE 2012 DEBTORS' *MDL 1720* DAMAGES CLAIMS WERE TRANSFERRED TO THE LITIGATION TRUST**

The Special Master's conclusion that the 2012 Debtors' *MDL 1720* damages claim were transferred to Cascade under its APA with Buffets Inc. is based on the false premise that such claims are not "Avoidance Actions". As noted above, such term includes 11 U.S.C. § 542(a) turnover claims. 11 U.S.C. § 542(a) gives the "trustee" (statutory trustee or debtor in possession under 11 U.S.C. § 1107) causes of action for turnover of property that can be used, sold or leased under 11 U.S.C. § 363, which were among the causes of action transferred to the Litigation Trust pursuant to the 2012 Plan and 11 U.S.C. § 1123(a)(5)(B). The Special Master's conclusion that *MDL 1720* damages were sold to Cascade under its APA with Buffets Inc. is an acknowledgment that such causes of action can be sold, such that they were previously transferred to the Litigation Trust. The case law confirms causes of action can be sold under 11 U.S.C. § 363. *E.g. In re*

11

*Moore*, 608 F.3d 253, 257 (5th Cir. 2010) ("As a general matter, a trustee may sell causes of action belonging to the estate"); *In re Fitzgerald*, 428 B.R. 872, 883 (B.A.P. 9th Cir. 2010) ("causes of action that exist independent of the bankruptcy can be, and often are, sold by bankruptcy trustees under section 363(b)"); *In re Pursuit Capital Management, LLC*, 2016 WL 5402735 (D. Del. 2016) (approving bankruptcy sale to creditors of causes of action against insiders under 11 U.S.C. § 363 and dismissing appeal of sale order taken by insiders as statutorily moot), *dismissing appeal*, 874 F.3d 124 (3d Cir. 2017) (as statutorily moot).

As *MDL 1720* damages claims were capable of being sold in bankruptcy they qualify as turnover claims that were transferred to the Litigation Trust. They therefore did not vest in the reorganized 2012 Debtors, and property of their estates constituting *MDL 1720* damages claims could not have been sold by Buffets Inc. to Cascade in 2013.

## II. EVEN HAD *MDL 1720 DAMAGES* CLAIMS VESTED IN THE REORGANIZED 2012 DEBTORS, NOT ALL CLAIMS WERE SOLD TO CASCADE

### A. The Cascade Sale Did Not Include *MDL 1720* Damages Claims of Any Entity Other than Buffets Inc.

Even had *MDL 1720* damages claims vested in the reorganized 2012 Debtors as opposed to the Litigation Trust, the Cascade APA could not have served to effectuate transfer of *MDL 1720* damages claims held by any entity other than Buffets Inc.

Buffets Inc. clearly lacked corporate authority to bind its own corporate parents i.e. Buffets Holdings Inc. (Conflict ID 261149) and Buffets Restaurant Holdings Inc. (Conflict ID 261152). (2012 Bankr. ECF #5-1 (corporate structure chart that is Exhibit A to "first day" declaration, 2012 Bankr. ECF #5); 2016 Bankr. ECF #23 ¶12 (summary of corporate structure)) over which Buffets Inc. did not exercise control.

With regard to Buffets Inc. subsidiaries, whose *MDL 1720* damages claims the Special Master concluded were transferred by the Cascade APA, it is well established a corporate parent

12

cannot sell its subsidiaries' assets. "A corporate parent which owns the shares of a subsidiary does not, for that reason alone, own or have legal title to the assets of the subsidiary". *Dole Food Co. v. Patrickson*, 538 U.S. 468, 475-76 (2003). *See also U.S. v. Wallach*, 935 F.2d 445, 462 (2d Cir. 1991) ("shareholders do not hold legal title to any of the corporation's assets. Instead, the corporation—the entity itself—is vested with the title"); *Advanced Video Technologies, LLC v. HTC Corp.*, 103 F. Supp. 3d 409, 419 (S.D.N.Y. 2015) (collecting cases applying same principle under Delaware law); *Goldstein v. Consol. Edison Co. of New York*, 115 A.D.2d 34, 39 (1st Dept 1986) ("a corporation is an entity distinct and separate from its shareholders, no one of whom has a right to receive legal title to any specific property of the corporation"); *U.S. v. Banyan*, 933 F.3d 548, 554 (6th Cir. 2019) (quoting *U.S. v. Bennett*, 621 F.3d 1131, 1136 (9th Cir. 2010)) (rejecting government argument that "the parent banks 'owned' the funds that the mortgage companies provided to the defendants, because the banks owned those companies"; "as the Ninth Circuit observed in rejecting the same argument, '[m]ore than a century of corporate law says otherwise'").

Thus, courts have long held that stockholders do "not have the power to transfer the assets of the corporation" i.e. a subsidiary of the stockholder. *De La Vergne Refrigerating Mach. Co. v. German Sav. Inst.*, 175 U.S. 40, 54 (1899). *See also* 1 Fletcher Cyc. Corp. § 31 ("The property of the corporation is its property and not that of the shareholders as owners, even if there is only one shareholder … Shareholders, even a controlling shareholder, cannot transfer or assign the corporation's properties and rights"); 18A Am. Jur. 2d Corporations § 625 ("Even complete ownership of all outstanding stock of a corporation is not the equivalent of ownership of a subsidiary's property or assets, because a parent and subsidiary comprise two wholly separate entities with individual property rights, no transfer of title to corporate property taking place").

13

Buffets Inc. therefore lacked authority to bind its direct and indirect subsidiaries or transfer their assets.

Notably, the 2012 and 2016 Debtors knew perfectly well how to bind themselves: their Chapter 11 plans, which provided for vesting of estate property in reorganized debtors or transfer to a post-confirmation trust were executed (2012 Plan PDF pp.61-64; see also 2016 Plan PDF p.56) by a corporate officer of each debtor. To the extent that *MDL 1720* damages claims vested in reorganized 2012 Debtors, said debtors could have easily executed an agreement to manifest mutual assent as to the sale of their *MDL 1720* damages claims, yet the record is devoid of evidence of mutual assent of any entity other than Buffets Inc.

The Schedule B that follows the Signed Data Authorization, on which the Special Master's determination is based, is not signed by any entity it purports to bind, putting aside authenticity issues discussed above. That is, even if it were contemporaneously prepared, Cascade cannot bootstrap entitlement to litigation claims of affiliates simply by way of exhibits that reference parties that were not sellers under the Cascade APA. Neither a Notice of Assignment nor an Authorization to Release Data can convey ownership of an entity's claim if it was not party to the APA. The parties would be noticing an assignment that did not occur, or authorizing release of transactional data for entities which had arguably not sold their claims, but neither would create or convey ownership rights to the purchaser. To find otherwise would be contrary to the language of the APA.

**B.      The Cascade Sale Did Not Include *MDL 1720* Damages Claims of Buffets Inc. that Accrued after the Commencement of its 2016 Bankruptcy**

The commencement of a bankruptcy case triggers the establishment of an estate pursuant to 11 U.S.C. § 541. The estate is considered a separate entity that is legally distinct from the pre-bankruptcy debtor. *In re Wright*, 545 B.R. 541, 551 (Bankr. S.D. Tex. 2016). "The estate is the

14

pot out of which creditors' claims are paid.  It is administered by either a trustee or, as in this case, the debtor itself.  See §§ 1101, 1107."  *Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 587 U.S. 370, 373 (2019).  Pursuant to 11 U.S.C. § 541(a)(1) and (a)(7) the estate includes unsold *MDL 1720* damages claims belonging to the debtor as of the commencement of its case as well as *MDL 1720* damages claims accruing during its bankruptcy.  Thus, when Buffets LLC fka Buffets Inc. filed its bankruptcy case in 2016, *MDL 1720* damages claims based on subsequent credit card transactions belonged to its estate, not the pre-bankruptcy debtor, regardless of what may have purported to have been sold to Cascade in 2013.[8]

Buffets LLC upon its emergence from bankruptcy in 2017 was likewise an entity legally distinct from its predecessor, the estate, vested only with estate property not transferred to the Unsecured Creditors Trust and not released.  *In re G-I Holdings, Inc.*, 580 B.R. 388, 430 (Bankr. D. N.J. 2018) ("the reorganized debtor is a new legal entity"); *In re Lacy*, 183 B.R. 890, 892 n.1 (Bankr. D. Colo. 1995) (similar).  Accordingly, Cascade has no entitlement to that entity's *MDL 1720* damages claims either.

And of course, when Buffets LLC filed bankruptcy again in 2021, that resulted in the establishment of a new, legally distinct estate whose *MDL 1720* damages claims (those that accrued following emergence bankruptcy in 2017, up to the 2021 bankruptcy filing, as well as those that accrued during the 2021 bankruptcy) Cascade has no entitlement to.

---

[8] Although, under 11 U.S.C. § 541(d), the estate excludes property held in trust, the Cascade APA did not establish a trust relationship.  *In re Mid-Island Hospital, Inc.*, 276 F.3d 123, 130 (2d Cir. 2002) ("When parties deal at arms length in a commercial transaction, no relation of confidence or trust sufficient to find the existence of a fiduciary relationship will arise absent extraordinary circumstances").  *See also In re Grubb & Ellis Co.*, 2012 WL 1036071, at *6 (Bankr. S.D.N.Y. Mar. 27, 2012) (discussing criteria for trust relationship under 11 U.S.C. § 541(d)).

11 U.S.C. § 363(b) prohibits the sale of estate property outside the ordinary course of business without prior bankruptcy approval, such that bankruptcy law precludes a 2013 transaction reaching property of the 2017 or 2021 Debtors' bankruptcy estates.

### III. THE OAK POINT PARTNERS AGREEMENTS EFFECTUATED TRANSFER OF THE POST-CONFIRMATION TRUSTS' *MDL 1720* DAMAGES CLAIMS TO IT

The Special Master erred in concluding (R&R at 20 n.19) that nothing in any of "the four APA's to which OPP was a party [only three are identified, R&R at 13-14] implies that the assets they conveyed had anything to do with *MDL 1720*, nor would reading those agreements to exclude the Buffets Entities' *MDL 1720* damages claims produce an absurd result".

As discussed above, the Litigation Trust established in 2012 was settled with "Transferred Avoidance Actions", defined to include (2012 Plan Article VII.D.2) 11 U.S.C. § 542(a) turnover claims, which in turn include *MDL 1720* damages belonging to the 2012 Debtors' estates.   The Unsecured Creditors Trust established in 2017 was settled with "Trust Assets", defined to include (2016 Plan Article VII.D.2; 2016 Bankr. ECF #2661-5, #2661-11) all claims and causes of action belonging to the 2016 Debtors' estates, which includes *MDL 1720* damages claims belonging to their estates given the definition of such terms under the plan and 11 U.S.C. § 1123(a)(5)(B).  And the Liquidating Trust established in 2021 was settled with "Liquidating Trust Assets", defined to include (2021 Plan Article II.B.7, 16, 52, 55) all manner of right to payment including through litigation, including *MDL 1720* damages claims that accrued after the 2016 bankruptcy and during the 2021 bankruptcy.  As noted above, the Liquidating Trust is the only entity to which estate property was transferred under 11 U.S.C. § 1123(a)(5)(B) or in which estate property vested.  Thus, *MDL 1720* damages claims constituting property of the 2021 Debtors' estates could not have been transferred or vested anywhere else.

The definition of "Remnant Assets" in OPP APA 3 includes any right to payment on account of a claim and encompasses *MDL 1720* damages claims. Its definition in OPP APA 1 is similar, except that it specifically includes AmEx Claims. The definition of "Residual Assets" in OPP APA 2 is also similar, except that it specifically includes "claims or proceeds of claims in settlement of class action or antitrust matters", which is how *MDL 1720* damages claims are described in the Cascade APA. Significantly, all definitions are keyed to a specific temporal period: debtor assets still held by the trust (excluding cash), "at the time of the execution of this Agreement and continuing into the future". In each cases the definitions refer to assets held by the trusts long after their establishment, after the trustees have had ample opportunity to monetize the trust res, hence the names Remnant and Residual Assets. (*See also* n.6 *infra*.)

The sale of such assets by bankruptcy trustees has been widely recognized and approved by courts. *E.g. In re Woldeyohannes*, 665 B.R. 543, 566 (Bankr. D. Conn. 2024) ("selling remnant assets of the estate … is generally allowed") (collecting cases), *appeal dismissed*, 2025 WL 1696209 (D. Conn. June 17, 2025); *In re Atlantic Gulf Communities Corp.*, 326 B.R. 294, 300 (Bankr. D. Del. 2005) (permitting the assignment of litigation claim by Chapter 7 trustee by means of a quitclaim deed). Indeed, other courts have recognized the transfer of causes of action pursuant to OPP remnant asset purchase agreements. *E.g. Oak Point Partners, LLC v. Blue Cross Blue Shield of Michigan*, 446 F. Supp. 3d 195, 199 (E.D. Mich. 2020) ("Oak Point purchased the debtors' causes of action as part of the remnant assets"). Particularly given the absence of legal authority to support the Special Master's conclusion concerning the effect of the OPP APAs, the Special Master's conclusions should be rejected and the transfer to OPP of Transferred Avoidance Actions, Trust Assets and Liquidating Trust Assets under the APAs, including *MCL 1720* damages claims transferred to the trusts pursuant to the plans, should be recognized.

17

IV.    **ALTERNATIVELY, THE MATTER SHOULD BE RESUBMITTED WITH INSTRUCTIONS TO PERMIT DISCOVERY ON THE DOCUMENT ATTACHED TO THE SIGNED DATA AUTHORIZATION**

Significant questions exist concerning the page attached to the Signed Data Authorization, submitted after the completion of briefing and on which the Special Master's recommendation was based.  In the summary judgment context (FRCP 56(d), "When Facts are Unavailable to the Nonmovant"), OPP would be entitled to discovery concerning same.  The Revised Special Master Order did not authorize discovery in proceedings before the Special Master.  However, this Court has authority to "resubmit [the matter] to the master with instructions" (FRCP 53(f)(1)) to permit discovery and issue a new report based on results of same.  Such relief is respectfully requested by OPP in the alternative.

## CONCLUSION

The Special Master's recommended findings and conclusions as to ownership of the *MDL 1720* damages claims should be rejected.  The Court should find and conclude that the *MDL 1720* damages claims of the 2012 Debtors were transferred to the Litigation Trust and sold to OPP pursuant to OPP APA 1, and then transferred to CCB as servicer and authorized representative; the *MDL 1720* damages claims of the 2016 Debtors were transferred to the Unsecured Creditors Trust and sold to OPP pursuant to OPP APA 3; and the *MDL 1720* damages claims of the 2021 Debtors were transferred to the Liquidating Trust and sold to OPP pursuant to OPP APA 2.  The Cascade APA only served to transfer Buffets Inc.'s *MDL 1720* damages claim that accrued between July 18, 2012 (plan effective date) and March 16, 2016 (filing of 2016 bankruptcy).  Settlement proceeds corresponding to the subject Conflict IDs should therefore be allocated among OPP, CCB and BSH accordingly.

18

Dated: New York, NY
      July 1, 2026

Amini LLC

/s/ Jeffrey Chubak
Avery Samet
Jeffrey Chubak
John W. Brewer
131 West 35th Street
12th Floor
New York, NY 10001
(212) 490-4700
asamet@aminillc.com
jchubak@aminillc.com
jbrewer@aminillc.com
Attorneys for Claimant Oak Point Partners, LLC

19

**EXHIBIT A**
**Conflicts IDs of Buffets Debtors by Case**

| Entity | TIN (last 4 digits) | Conflicts ID | 2012 Debtor | 2016 Debtor | 2021 Debtor |
|---|---|---|---|---|---|
| Buffets Holdings Inc. | -4018 | 261149 | X | | |
| Buffets Leasing Co. LLC | -8138 | 261129 | X | | |
| HomeTown Leasing Co. LLC | -8142 | 261130 | X | | |
| OCB Leasing Co. LLC | -8147 | 261137 | X | | |
| Tahoe Joe's Leasing Co. LLC | -8145 | 261150 | X | | |
| Buffets Restaurants Holdings Inc. | -9569 | 261152[1] | X | | |
| Ryan's Restaurant Leasing Co. LLC | -7405 | 261153 | X | | |
| Fire Mountain Leasing Co. LLC | -7452 | 261147 | X | | |
| Buffets Franchise Holdings LLC | -8749 | 261139 | X | | |
| Ryan's Restaurant Group LLC | -7895 | 261199 | X | X | X |
| Buffets LLC fka Buffets Inc. | -2294 | 261449 | X | X | X |
| Fire Mountain Restaurants LLC | -8003 | 261307 | X | X | X |
| OCB Purchasing Co. | -7610 | 261143 | X | X | X |
| Tahoe Joe's Inc. | -7129 | 261263 | X | X | X |
| HomeTown Buffet Inc. | -3002 | 261136 | X | X | X |
| OCB Restaurant Co. LLC | -7607 | 261290 | X | X | X |
| FMP-Ovation Payroll LLC | -1728 | -- | | | X |
| Food Management Partners Inc. | -7374 | -- | | | X |
| FMP SA Management Group LLC | -3031 | -- | | | X |
| Fresh Acquisitions LLC | -2795 | -- | | | X |
| Alamo Ovation LLC | -9002 | -- | | | X |
| FMP-Fresh Payroll LLC | -8962 | -- | | | X |
| Alamo Fresh Payroll LLC | -1590 | -- | | | X |
| Alamo Buffets Payroll LLC | -0998 | -- | | | X |

---

[1] This Conflicts ID is mistakenly attributed to Ryan's Restaurant Group LLC (which has a duplicate entry) in the Appendix to the R&R. The correct Conflicts ID is that attributable to Buffets Restaurants Holdings Inc. in the caption.

**EXHIBIT B**
**Conflicts IDs of Other Buffets Entities**

| Entity | Conflicts ID | Successor Entity |
|---|---|---|
| Ryan's Restaurant Management Group, LLC | 261141 | Fire Restaurants LLC |
| Distinctive Dining, Inc. | 261144 | HomeTown Buffet Inc. |
| Fire Mountain Management Group, LLC | 261148 | Fire Mountain Restaurants LLC |
| Big R Procurement Company, LLC | 261151 | Ryan's Restaurant Group LLC |

In 2009, Big R Procurement Company, LLC merged into Ryan's Restaurant Group LLC formerly Ryan's Restaurant Group Inc. in 2009, Fire Mountainside Management Group LLC merged into Fire Mountain Restaurants LLC formerly Fire Mountain Restaurants Inc. in 2009 and Ryan's Restaurant Management Group, LLC merged into Ryan's Restaurant Group Inc.  Distinctive Dining Inc. was a wholly-owned subsidiary of HomeTown Buffet Inc. that dissolved in 2006, such that its remaining rights and assets inured to the benefit of HomeTown Buffet Inc.  (Chubak Decl. Exhibits 7-11.)

## **WORD COUNT CERTIFICATION**

I hereby certify that the foregoing document has 5,942 words as calculated by the word processing software used to prepare the document, including Exhibits A-B but excluding the caption, table of contents, table of authorities and signature block, and therefore complies with the word count limit in Local Civil Rule 7.1(c) and Individual Practice III.C.1.

/s/ Jeffrey Chubak