UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE MDL 1720 DAMAGES CLASS SETTLEMENT DISPUTES | Case No. 1:26-mc-02391-BMC-JAM<br><br>**CLAIMANT BLUE STURGEON HOLDINGS, LLC'S OPPOSITION TO THE OBJECTION OF OAK POINT PARTNERS, LLC TO THE SPECIAL MASTER'S REPORT AND RECOMMENDATION** |

**CLAIMANT BLUE STURGEON HOLDINGS, LLC'S OPPOSITION TO THE OBJECTION OF OAK POINT PARTNERS, LLC TO THE SPECIAL MASTER'S REPORT AND RECOMMENDATION**

Blair Will, Esq.
CLARK HILL LLP
505 Montgomery Street, 13th Floor
San Francisco, CA 94111
(415) 984-8500
Email: bwill@clarkhill.com

Attorneys for Claimant, Blue Sturgeon
Holdings, LLC

1

CLARKHILL\105068\1014633\288800351.v1-7/22/26

## TABLE OF CONTENTS

I.      INTRODUCTION ....................................................................................................5

II.     LEGAL STANDARD.............................................................................................8

III.    BACKGROUND .....................................................................................................9

        A.      The 2012 Plan and the Competing Chains of Title.....................................9

        B.      The 2013 Buffets–Cascade and Cascade–BSH Transactions...............................11

        C.      The Later Bankruptcy Trusts and OPP Agreements..............................................14

        D.      The Litigation Trust Agreement ..................................................................14

        E.      The Unsecured Creditors Trust Agreement ................................................14

        F.      The Fresh Acquisition Liquidating Trust Agreement...........................................15

IV.     ARGUMENT..........................................................................................................15

V.      THE SPECIAL MASTER'S REPORT CORRECTLY CONCLUDES
        THAT THE 2012 PLAN VESTED THE MDL 1720 CLAIMS IN THE
        RESPECTIVE REORGANIZED DEBTORS WHICH THEN SOLD THE
        MDL 1720 CLAIMS TO CASCADE WHICH SUBSEQUENTLY WERE
        CONVEYED TO BSH ...........................................................................................16

        A.      The Report distinguishes the MDL antitrust claims from the
                "Avoidance Actions" transferred to the Litigation Trust........................................16

        B.      OPP's § 542 theory conflates estate property with a turnover cause
                of action. ...............................................................................................17

        C.      OPP's § 363 authorities establish only that independent causes of
                action may be sold; they do not transform those claims into § 542
                claims. ...................................................................................................18

        D.      Because the MDL claims vested outside the Litigation Trust,
                OPP's 2016 chain of title fails. ..................................................................18

VI.     THE REPORT CORRECTLY CONCLUDES THAT THE 2013
        TRANSACTIONS TRANSFERRED THE MDL CLAIMS TO
        CASCADE AND THEN TO BSH ........................................................................19

        A.      The Buffets–Cascade APA conveyed the contingent MDL
                recovery, not merely an identification list. ..........................................................19

CLARKHILL\105068\1014633\288800351.v1-7/22/26

B.     The schedules were material closing and claim-administration documents, but did not themselves define or effect the scope of the conveyance...................................................................................................20

C.     OPP's affiliate argument raises, at most, entity-specific authority questions; it does not confine the transaction to Buffets, Inc.'s formal name. .......................................................................................21

D.     Cascade conveyed to BSH the same Asset it had acquired from Buffets.....................................................................................................22

VII.    THE REPORT CORRECTLY REJECTS OPP'S ALTERNATIVE THEORIES BASED ON LATER TRANSACTIONS AND BANKRUPTCIES ....................................................................................22

A.     OPP does not establish that later payment-card transactions created distinct causes of action owned by the later debtors...............................23

B.     Sections 541 and 363 do not place previously conveyed property into a later bankruptcy estate. ...............................................................23

C.     The later trusts could convey only assets actually owned by the debtors and trusts. ...............................................................................24

D.     OPP's own agreements underscore the limitations in its asserted chain of title. .......................................................................................24

VIII.   OPP'S ALTERNATIVE REQUEST FOR DISCOVERY OR FURTHER SPECIAL-MASTER PROCEEDINGS SHOULD BE DENIED .....................................25

IX.    CONCLUSION....................................................................................27

CLARKHILL\105068\1014633\288800351.v1-7/22/26

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Howard's Appliance Corp.*,
  874 F.2d 88 (2d Cir. 1989)............................................................................9, 25

*Paddington Partners v. Bouchard*,
  34 F.3d 1132 (2d Cir. 1994).................................................................................28

*In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*,
  MDL No. 1720...............................................................................................12

*In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*,
  No. 05-md-1720, ECF No. 9403..........................................................................10

*United States v. Whiting Pools, Inc.*,
  462 U.S. 198 (1983)..................................................................................7, 18

**Statutes**

Bankruptcy Code, 11 U.S.C.
  § 11.....................................................................................7, 11, 15, 16
  § 1141(b).................................................................................7, 11, 17
  § 363.................................................................................7, 18, 19, 25
  § 363(b)(1) ..............................................................................9, 25
  § 510...............................................................................11, 16, 17, 26
  § 541(a)(1) ..........................................................................7, 9, 18, 25
  § 542.....................................................................9, 11, 16, 17, 18, 19, 26, 27
  § 543..............................................................................11, 16, 25
  § 544............................................................................................11
  § 545............................................................................................11
  § 547............................................................................................11
  § 548............................................................................................11
  § 550............................................................................................11
  § 551.....................................................................................11, 17

**Other Authorities**

Fed. R. Civ. P.
  53................................................................................................9
  53(f)(1)................................................................................9, 10, 28
  53(f)(3)..........................................................................................9
  53(f)(3)–(4) ...................................................................................10
  56(d)............................................................................................28

CLARKHILL\105068\1014633\288800351.v1-7/22/26

Blue Sturgeon Holdings, LLC ("BSH"), as owner of the MDL 1720 claims associated with the "Buffets Entities" (aka, the "Buffets Claims"), submits this memorandum in opposition to the Objection of Oak Point Partners, LLC, to the Special Master's Report and Recommendation, ECF No.2 ("Report"). The Special Master correctly concluded that the Buffets Claims were conveyed to BSH in 2013 pursuant to written contracts and BSH has retained ownership of the Buffet Claims to the present.   Oak Point Partners, LLC's, ("OPP") Objection presents no information or arguments that the Special Master did not already consider in reaching his conclusions and rendering his recommendation.   Accordingly, the Objection of OPP should be disregarded.

## I.    INTRODUCTION

In its Objection to the Report, OPP presents three questions:

(1) Were the MDL 1720 claims associated with the entities the Special Master calls the "Buffets Entities" vested when the 2012 [Buffets bankruptcy] Plan became effective?

(2) What rights did the July 2013 Buffets–Cascade Settlement Services and Cascade Settlement Services–BSH transactions convey?

(3) Did the later payment-card transactions or the sequential bankruptcy proceedings create distinct rights that passed to OPP?

The Special Master carefully addressed each of these questions and resolved each in Blue Sturgeon Holdings LLC's favor.

The Special Master concluded that the 2012 Plan did not transfer the MDL claims to the Litigation Trust.

The Special Master concluded that the MDL claims instead vested in the respective reorganized debtors and were conveyed through the July 2013 transactions to Cascade Settlement Services LLC ("Cascade") and then Blue Sturgeon Holdings LLC ("BSH").

5

The Special Master concluded that the later bankruptcy estates and trusts could not acquire claims the Buffets Entities no longer owned. (See, Report and Recommendation of Special Master ("Report"), ECF No. 2, at 19–21).

OPP's Objection identifies no error warranting departure from the Special Master's conclusions.

OPP bases its contrary argument on the residual-asset purchase agreements that were executed much later than 2013. This argument is exactly backwards. OPP assumes that the selling trusts must have owned the disputed MDL rights because those later residual-asset purchase agreements broadly described unknown claims, antitrust recoveries, or assets continuing into the future. But even a broadly worded conveyance can only transfer property the seller actually owns.

With regard to the dispute at hand, the controlling inquiry runs in the opposite direction: what property did each bankruptcy trust receive, and what remained in that trust when it contracted to sell residual assets to OPP? A catch-all conveyance may transfer an unidentified asset the seller owns but it cannot create title to property the seller never received or that a debtor previously sold.

The Special Master correctly concluded that the 2012 Litigation Trust never received these MDL claims. The 2012 Plan explicitly transferred defined "Avoidance Actions"—claims arising out of or maintainable under specified Bankruptcy Code provisions—to the Litigation Trust, while all the other bankruptcy estate property vested in the respective reorganized debtors. See 11 U.S.C. § 1141(b); Report at 19–21.[1]

---

[1] Section 542(a) of the Bankruptcy Code (11 U.S.C. 542) addresses turnover of qualifying property in another entity's "possession, custody, or control" so that the property may be administered by the U.S. Trustee under § 363 of the Bankruptcy Code. (See *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 205–206 (1983).) However,   Section 542(a) does not reclassify every salable estate asset as a turnover cause of action. OPP's cited authorities establish only that U.S. Trustees may sell independently arising causes of action. See Objection of Claimant Oak Point Partners, LLC ("Obj."), ECF No. 3, at 15–16.

CLARKHILL\105068\1014633\288800351.v1-7/22/26

The MDL claims arose under federal antitrust law. Therefore, the MDL claims remained outside the Litigation Trust and were available to be conveyed and transferred through the 2013 transaction between Buffets and Cascade (and then from Cascade to BSH). And, in fact, the MDL Claims were transferred by Buffets to Cascade (and then to BSH).

What rights were transferred? The Buffets–Cascade Asset Purchase Agreement ("APA") defined the purchased "Asset" as the contingent monetary recovery arising from MDL 1720 and expressly conveyed all rights associated with that contingent monetary recovery from Buffets to Cascade.

The related Notice of Assignment ("Notice") transferred specific functional rights associated with the MDL claims: the rights to file and administer the claim, receive payment, and challenge any estimate.

The signed Authorization to Obtain Transactional Data ("Data Authorization") separately acknowledged that Buffets "has assigned to Cascade all rights to any settlement arising from" the MDL and authorized Cascade to obtain the transactional data needed to substantiate the claims. See Obj., Ex. 1, Recitals F, H & Ex. A; Obj., Ex. 2 at 1.

Thus, it is clear from the controlling agreements that Buffets sold the MDL claims to Cascade and Cascade transferred the same MDL claims to BSH the next day. OPP identifies no defect in that transfer and does not materially dispute that Cascade conveyed whatever it acquired to BSH. Report at 9.

OPP's remaining theories—that Buffets lacked authority as to particular entities or that later interchange payment transactions created new claims—raise narrower questions about the scope of the conveyed Assets. But, here, OPP fails to present any distinct later-accruing cause of

7

action or show that a particular TIN corresponded to a separately owned claim outside Buffets' authority.[2]

BSH respectfully thanks the Special Master for his careful consideration of this complex, document-intensive dispute. The Report reflects a thorough review of the competing chains of title, the bankruptcy Plan provisions, and the operative transaction documents, and provides a clear and well-reasoned basis for the Special Master's conclusions. BSH appreciates the substantial time and attention the Special Master devoted to resolving the issues presented.

Finally, OPP's alternative discovery request should be denied. OPP received the signed Data Authorization, and the unsigned Schedule B page appearing with it, before the Report issued. OPP did not seek authentication of evidence or targeted discovery at that time. Moreover, OPP now identifies no particular witness, document, or custodian likely to alter the Report's conclusions. Rule 53(f)(1) permits the Court to receive evidence or resubmit a matter, but it does not itself support a right to post-recommendation discovery.

The Court should deny OPP's discovery request, overrule the Objection and adopt the Report in full.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 53 governs review of a special master's report. The Court must decide de novo all objections to findings of fact, unless the parties—with the Court's approval—stipulate to clear-error review or finality as permitted by Rule 53(f)(3). The Court must

---

[2] The later bankruptcies and OPP residual asset agreements do not cure the earlier gap in title. Section 541(a)(1) places in an estate the debtor's legal and equitable interests in property "as of the commencement of the case," and § 363(b)(1) authorizes use, sale, or lease of "property of the estate." Neither provision gives an estate a property interest the debtor did not hold at filing. See 11 U.S.C. §§ 541(a)(1), 363(b)(1); *In re Howard's Appliance Corp.*, 874 F.2d 88, 93 (2d Cir. 1989). Each OPP agreement likewise transferred only the selling trust's existing "right, title and interest" in assets remaining and not previously sold, assigned, or transferred. Obj., Exs. 4–6. OPP APA 2 further illustrates the difficulty with OPP's classification: it excludes claims and proceeds held under § 542 and related provisions, even as OPP invokes § 542 to place the claims in the 2012 Litigation Trust. Obj., Ex. 6 at 1.

CLARKHILL\105068\1014633\288800351.v1-7/22/26

decide de novo all objections to conclusions of law. Fed. R. Civ. P. 53(f)(3)–(4); see Revised Order Appointing Special Master, *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, No. 05-md-1720, ECF No. 9403 ¶ 1 (E.D.N.Y. Sept. 3, 2024) ("Revised Special Master Order"); Obj. at 7. In acting on the Report, the Court must give the parties notice and an opportunity to be heard; it may receive evidence and may "adopt or affirm, modify, wholly or partly reject or reverse, or resubmit to the master with instructions." Fed. R. Civ. P. 53(f)(1).

De novo review calls for an independent determination of the objections; it does not require the Court to disregard the Special Master's analysis or repeat the proceedings.

The Court may adopt the Report where its findings and conclusions are supported by the governing documents, law, and record.

Rule 53(f)(1) permits—but does not require—the Court to receive additional evidence. It does not create a right to discovery or supplementation whenever a party objects.

The governing order in this matter directs the Special Master to resolve referred claim(s) or disputes and issue reports and recommendations. OPP concedes that the order did not authorize discovery. Revised Special Master Order ¶ 1; Obj. at 18.

Here, the Special Master received the parties' documentary and supplemental submissions and resolved the ownership questions referred to him. Report at 1–21. OPP's merits objections are subject to de novo review; its separate request to reopen the record remains discretionary and should be evaluated against the limited scope of the reference and OPP's prior opportunity to present its case.

### III.   BACKGROUND

**A.   The 2012 Plan and the Competing Chains of Title**

Sixteen related entities, including Buffets, Inc. (collectively, the "2012 Debtors"), commenced chapter 11 proceedings in the United States Bankruptcy Court for the District of

Delaware on January 18, 2012. Their Second Amended Joint Plan of Reorganization was confirmed on June 27, 2012, and became effective on July 18, 2012 (the "Plan"). Obj. at 3–4; Report at 6–7.

The Plan established a Litigation Trust funded with cash. It transferred to that Litigation Trust only defined "Transferred Avoidance Actions," that is, "Avoidance Actions" other than specified exclusions.

"Avoidance Actions" were estate claims or causes of action "arising out of or maintainable pursuant to sections 510, 542, 543, 544, 545, 547, 548, 550 or 551 of the Bankruptcy Code or under any other similar applicable law." Obj. at 8; Obj., Ex. 14, 2012 Plan, Arts. I.A & VII.D.2.

Under the Plan, all other estate property vested in the respective reorganized debtor on the effective date (collectively, the "Reorganized Debtors"). Buffets, Inc. was one of those Reorganized Debtors. Accordingly, if the MDL claims were not "Avoidance Actions," they vested in Buffets—not the litigation trust. 11 U.S.C. § 1141(b); 2012 Plan, Art. V.D; Report at 19–20.

BSH contends—and the Special Master concluded—that the MDL 1720 claims arose under federal antitrust law and were therefore not "Avoidance Actions" and consequently the MDL claims vested in the respective Reorganized Debtors under the Plan. Subsequently, the July 2013 asset purchase transactions conveyed the right of the Buffets Entities, including Buffets, Inc., to any possible monetary recovery associated with the MDL claims, first to Cascade, and then from Cascade to BSH. Report at 19–21.

OPP contends that the claims instead followed one or more Buffets bankruptcy-trust chains. First, OPP argues that the 2012 Plan transferred the claims to the Litigation Trust, not to the Reorganized Debtor, and the Litigation Trust sold these assets to OPP in 2016.

CLARKHILL\105068\1014633\288800351.v1-7/22/26

Second, OPP asserts that claims attributable to later payment-card transactions became property of the Buffets debtors that commenced new bankruptcy cases in 2016 and these claims passed to an Unsecured Creditors Trust, which sold its remaining assets to OPP in 2022.

Third, OPP asserts that still-later claims became property of the Buffets debtors that commenced bankruptcy cases in 2021, that the claims passed to the Fresh Acquisition Liquidating Trust, and were included in a separate 2022 sale to OPP. Obj. at 1–2, 7–11.

The Special Master rejected all of these asserted chains of title. He concluded that the MDL claims were "categorically distinct" from the bankruptcy claims, the causes of action, and the remedies enumerated in the Plan's definition of Avoidance Actions. The Litigation Trust therefore never owned the MDL claims and could not later convey them to OPP. Report at 19–21.

The Special Master further concluded that the claims were conveyed through the 2013 Buffets–Cascade and Cascade–BSH transactions and consequently could not have been, and were not, property of any of the later Buffets bankruptcy estates or trusts. Id. at 20–21.

## B.    The 2013 Buffets–Cascade and Cascade–BSH Transactions

On July 2, 2013, Buffets, Inc. and Cascade entered into an Asset Purchase and Sale Agreement specifically related to the possible monetary recovery arising from *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, MDL No. 1720. Obj., Ex. 1 ("Cascade APA").

The Cascade APA identified the pending litigation and recognized that Buffets might become entitled to a monetary recovery through judgment or settlement. The Cascade APA defined that contingent monetary recovery as the "Asset." Cascade APA, Recitals A, F & H. In the Cascade APA, Buffets and Cascade expressed their intent to transfer to Cascade "any and all" of Buffets' right, title, and interest "in or associated with, or connected in any manner to," any Asset arising from the [MDL No. 1720] class action litigation. *Id.*, Recital F.

11

The Cascade APA provided for closing on or before July 3, 2013. No later than closing, Buffets was required to execute and deliver a Notice of Assignment (in the form attached as Exhibit A to the Cascade APA) and an Authorization to Obtain Transactional Data (in the form attached as Exhibit B to the Cascade APA). Payment of the purchase price was conditioned on Buffets' performance of these closing obligations, including delivery of the completed schedules associated with those ancillary documents. Cascade APA § 2.2(a)–(c).

The Notice of Assignment transferred to Cascade all of Buffets' right, title, and interest "in and to or associated with, or connected in any manner to," any recovery arising from MDL 1720. These rights included the rights to file a claim, receive any recovery, and challenge payment estimates. The Notice further stated that Cascade was "the legal and equitable owner of all rights associated with any Recovery." Obj., Ex. 1 at 11. The Notice separately stated that Buffets had provided merchant-identification information on accompanying schedules. *Id*.

The separately executed Authorization to Obtain Transactional Data similarly distinguished the assignment of the settlement rights from the collection of information used to administer those rights. It first recited that Buffets "has assigned to Cascade all rights to any settlement arising from" MDL 1720. It then authorized Cascade to obtain "any and all" transactional data relating to credit- and debit-card transactions in which Buffets received payment, "including, but not limited to," merchant-identification information listed on the accompanying schedules. Obj., Ex. 2 at 1.

The schedules requested affiliated corporate names, subsidiaries, former names, DBAs, merchant identifiers, and TINs associated with the company identified in the Notice. Schedule B requested affiliated corporations, subsidiaries, former names, and TINs; Schedule C requested DBAs of the corporation and related entities. Obj., Ex. 2 at 2–3.

The Cascade APA also contained provisions addressing the contingent and not-yet-liquidated nature of the purchased recovery rights. Buffets represented that it possessed the authority to execute the Cascade APA and related documents, that it had good and marketable title to the Asset, and that it had not previously transferred any interest in the Asset. Cascade APA §§ 3.2, 3.5.

Buffets further acknowledged that the final amount and value of the Recovery could not yet be determined, agreed to furnish additional information and instruments necessary for claim administration or audit, and agreed to forward any payment mistakenly delivered to it after the sale. *Id*. §§ 3.6, 3.9, 5.1 & 5.4.

On July 3, 2013, Cascade entered into an Origination and Service Agreement ("OSA") with BSH, under which Cascade transferred to BSH "all right, title, and interest" in the Asset it had acquired from Buffets, subject only to retained servicing and fee rights. Under the OSA, Cascade remained BSH's agent for claim administration, collection of supporting data, communications with the claims administrator, and submission of claim materials. Report at 9 (citing BSH's May 14, 2026 submission, Ex. A, Cascade–BSH OSA, Recital A & §§ 2.1, 2.4–2.5).

The Special Master found that, although the parties disputed the scope of the Asset Buffets conveyed to Cascade, "there appears to be no disagreement that Cascade sold that same Asset to BSH." Report at 9.

The Special Master ultimately recommended that the Court find that the Buffets–Cascade APA transferred ownership of the Buffets Entities' MDL claims to Cascade on July 2, 2013, and that the Cascade–BSH agreement transferred those rights to BSH the following day. *Id*. at 21.

13

### C.     The Later Bankruptcy Trusts and OPP Agreements

OPP asserts dubious alternative chains of title based on three later agreements (one executed in 2016 and two in 2022) through which OPP contends it purchased remnant or residual assets from Buffets bankruptcy trusts. Notably, each of the  agreements that OPP cites was limited to the selling trust's existing interest in qualifying property remaining in the trust and not previously sold, assigned, or transferred.

### D.     The Litigation Trust Agreement

On September 30, 2016, the Litigation Trust and OPP entered into a Purchase Agreement and Assignment of Claims and Interests. Obj., Ex. 4 ("OPP APA 1"). It defined "Remnant Assets" as property "of the Trust remaining" at execution and into the future, consisting of known or unknown assets or claims not previously sold, assigned, or transferred. OPP APA 1 at 1. It specifically identified claims against American Express and its affiliates, but not MDL 1720, and conveyed only the Trust's "right, title and interest" in the defined assets on an "as is, where is" basis. *Id*. §§ 2, 5. The Special Master concluded that OPP APA 1 did not convey the MDL claims because the Litigation Trust had never received them under the 2012 Plan. Report at 20–21.

### E.     The Unsecured Creditors Trust Agreement

Buffets LLC, formerly Buffets, Inc., and six related entities commenced new chapter 11 cases in 2016. Their debtors Plan, which became effective on May 18, 2017, established an Unsecured Creditors Trust funded with defined "Trust Assets," including broadly described causes of action belonging to the 2016 estates. Obj. at 8–9; Obj., Exs. 18–24.

On March 29, 2022, the Unsecured Creditors Trust entered into an Asset Purchase Agreement with OPP. Obj., Ex. 5 ("OPP APA 3"). It defined "Remnant Assets" as property "of [the] Trust remaining" at execution and into the future, consisting of known or unknown assets or claims not previously sold, assigned, or transferred; identified the seven debtors whose trust assets

14

were potentially included; and conveyed only the Trust's "right, title and interest" in those assets. OPP APA 3 at 1 & n.1, § 2. The agreement did not identify MDL 1720 and disclaimed warranties except as expressly provided. *Id*. §§ 8, 10–11. The Special Master concluded that the Unsecured Creditors Trust did not acquire or convey the MDL claims because the 2016 debtors no longer owned them when those cases commenced. Report at 20–21.

**F.      The Fresh Acquisition Liquidating Trust Agreement**

Buffets LLC and fourteen related entities commenced additional chapter 11 cases on April 20, 2021. Their liquidating Plan became effective on December 20, 2021, and transferred the debtors' remaining assets to the Fresh Acquisition Liquidating Trust. Obj. at 9–11; Obj., Exs. 25–27.

In March 2022, the Fresh Acquisition Liquidating Trust entered into another Asset Purchase Agreement with OPP. Obj., Ex. 6 ("OPP APA 2"). It defined "Residual Assets" as specified categories of known or unknown property not previously sold, assigned, or transferred, including claims or proceeds arising from class-action or antitrust settlements, but conveyed only the Trust's "right, title and interest" in qualifying assets. OPP APA 2 at 1, §§ 2, 5. It also excluded "all claims, and any related litigation or settlement proceeds, held by the Trust pursuant to" §§ 510, 542, 543, 544, 547, 548, 549, 550, and 553. *Id*. at 1. The Special Master concluded that the 2021 debtors and Liquidating Trust did not own or convey the MDL claims because those claims had already been transferred in 2013. Report at 20–21.

### IV.      <u>ARGUMENT</u>

The Report correctly resolved each link in the competing chains of title.  OPP's Objection supplies no basis to disturb those conclusions or reopen the proceedings before the Special Master.

CLARKHILL\105068\1014633\288800351.v1-7/22/26

**V.     THE SPECIAL MASTER'S REPORT CORRECTLY CONCLUDES THAT THE 2012 PLAN VESTED THE MDL 1720 CLAIMS IN THE RESPECTIVE REORGANIZED DEBTORS WHICH THEN SOLD THE MDL 1720 CLAIMS TO CASCADE WHICH SUBSEQUENTLY WERE CONVEYED TO BSH**

The Special Master concluded that the MDL claims were not among the narrowly defined "Transferred Avoidance Actions" in the 2012 Plan and therefore they vested in the respective Reorganized Debtors and remained outside the Trust. In coming to this conclusion, the Special Master applied the 2012 Plan's text.

OPP instead attempts to transform an antitrust claim into a bankruptcy turnover claim because the antitrust claim was estate property that might be capable of sale. That reasoning conflates the nature of an asset with a remedy that may be available to recover possession of estate property. It does not identify error in the Report's analysis.

**A.     The Report distinguishes the MDL antitrust claims from the "Avoidance Actions" transferred to the Litigation Trust.**

The 2012 Plan did not transfer every claim or cause of action belonging to the bankruptcy estates to the Litigation Trust. The 2012 Plan transferred only the defined "Transferred Avoidance Actions": estate claims or causes of action "arising out of or maintainable pursuant to" §§ 510, 542, 543, 544, 545, 547, 548, 550, or 551 of the Bankruptcy Code, or analogous law. All other estate property vested in the respective Reorganized Debtor when the Plan became effective. See 11 U.S.C. § 1141(b); 2012 Plan, Arts. I.A, V.D & VII.D.2; Report at 19–21.

The Report focused on the substantive character of the disputed claims. Sections 510 and 542 through 551 concern bankruptcy-specific rights and remedies: equitable subordination, turnover, avoidance of liens and transfers, recovery of avoided property, and preservation of avoided transfers. The MDL claims here arise from alleged anticompetitive conduct in the payment-card industry; their source, elements, and measure of recovery derive from federal antitrust law, not a Bankruptcy Code provision enumerated in the 2012 Plan. The Report

16

accordingly described the antitrust claims as "categorically distinct" from the bankruptcy claims, causes of action, and remedies included within the Plan's definition. Report at 20.

The Special Master's conclusion gives effect to the 2012 Plan's distinction between Transferred Avoidance Actions and other estate property. Because virtually any estate property may, in appropriate circumstances, become the object of a turnover demand, OPP's alternate interpretation would sweep ordinary contract, tort, statutory, and property rights into the Litigation Trust merely because they once belonged to an estate. The 2012 Plan limited the transferred claims to those "arising out of or maintainable pursuant to" the enumerated provisions of the bankruptcy code.  It did not include every asset that might hypothetically become the subject of turnover. The Report therefore properly concluded that the MDL claims vested in the respective Reorganized Debtors and that the Litigation Trust never acquired or conveyed them. Report at 20–21.

**B.     OPP's § 542 theory conflates estate property with a turnover cause of action.**

OPP's principal response is that the MDL claims were "turnover claims" under § 542(a). Obj. at 15–16. Section 542(a) directs an entity "in possession, custody, or control, during the case," of qualifying property to deliver that property to the trustee, subject to stated exceptions. 11 U.S.C. § 542(a). It enables the trustee to obtain and administer property under § 363. See *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 205–06 (1983). It does not change the substantive source or nature of the underlying asset.

OPP identifies no person who withheld the MDL claims, no demand for their delivery, and no turnover proceeding. It relies only on the claims' status as property that could be sold under § 363. That establishes, at most, that the claims were estate assets before confirmation; it does not establish that they arose under or were maintainable pursuant to § 542. As the Report noted, OPP's submissions to the Special Master assumed rather than explained that point. Report at 20.

CLARKHILL\105068\1014633\288800351.v1-7/22/26

**C.    OPP's § 363 authorities establish only that independent causes of action may be sold; they do not transform those claims into § 542 claims.**

OPP's § 363 authorities recognize that independently arising causes of action may be sold as estate property. Obj. at 15–16. Saleability under § 363 does not change a claim's substantive source: a trustee may sell a contract, patent, or antitrust claim without transforming it into a § 542 cause of action.

OPP's reasoning diverges from two valid premises—that § 542 concerns certain estate property and that causes of action may be sold under § 363—to the unsupported conclusion that every salable cause of action is itself maintainable under § 542. Neither the statutory text nor OPP's cases supports that divergent conclusion.

**D.    Because the MDL claims vested outside the Litigation Trust, OPP's 2016 chain of title fails.**

Once OPP's § 542 premise is rejected, its asserted chain through the Litigation Trust fails at its first link. The 2012 Plan transferred only the defined Avoidance Actions to the Litigation Trust and vested other estate property in the respective Reorganized Debtors. Because the MDL antitrust claims fell into the latter category, they were property of the Reorganized Debtors, not the Litigation Trust. The fact that the Litigation Trust never owned the MDL claims completely disposes of OPP's claim to any ownership of the MDL claims.

OPP APA 1 cannot alter the 2012 Plan's disposition.  OPP APA 1covered only assets "of the Trust remaining" and conveyed only the Trust's existing "right, title and interest." Obj., Ex. 4 at 1–2. The Report concluded that the Litigation Trust never acquired the MDL claims and thus never conveyed them to OPP. The Court should adopt the Report's conclusion.

### VI.      THE REPORT CORRECTLY CONCLUDES THAT THE 2013 TRANSACTIONS TRANSFERRED THE MDL CLAIMS TO CASCADE AND THEN TO BSH

Because the Plan vested the MDL claims outside the Litigation Trust, the next question is what rights the 2013 documents conveyed through Buffets. The Report concluded that the Buffets–Cascade transaction transferred the MDL claims (and monetary recovery related thereto) from Buffets to Cascade and that Cascade transferred the same Asset to BSH the following day. Report at 8–9, 20–21.

OPP attempts to reduce the scope of the transfer under the 2013 transactions by treating the associated schedules as though the schedules (not the actual sale agreements) defined the assignment of claims and by separating enterprise merchant activity into rights Buffets supposedly could and could not convey.  However, a simple reading of the operative documents clearly shows that the transaction conveyed the contingent Recovery itself (the monetary recovery related to the MDL claims). The Notice and signed Data Authorization further confirm that conveyance and provide the means to identify and administer it.

### A.      The Buffets–Cascade APA conveyed the contingent MDL recovery, not merely an identification list.

The July 2, 2013 APA was directed specifically to MDL 1720. It identified the litigation, recognized that Buffets might become entitled to a monetary recovery through judgment or settlement, defined that contingent "Recovery" as the purchased "Asset," and expressed the parties' intent to transfer "any and all" of Buffets' right, title, and interest in, associated with, or connected in any manner to that Asset. Obj., Ex. 1, Recitals A, F & H; Report at 7–9.

The remaining provisions confirm a present sale of an uncertain, contingent recovery. Buffets represented its authority and good title, acknowledged that the Recovery's final value could not yet be determined, agreed to cooperate in audits and claim administration, and agreed to forward any payment mistakenly sent to it. Cascade APA §§ 3.2, 3.5–3.6, 3.9, 5.1, 5.4. Those are

CLARKHILL\105068\1014633\288800351.v1-7/22/26

incidents of selling a contingent asset whose value would be established through later administration, not of transferring a static list of TINs.

The Report therefore treated the object of the sale as the MDL recovery itself. The Report's recommendation that the Buffets–Cascade APA transferred ownership of the Buffets Entities' MDL claims rests principally on the Cascade APA's definition of "Asset" and the clearly stated conveyance of the Asset, as confirmed by the related transaction documents. Report at 8–9, 21.

**B.    The schedules were material closing and claim-administration documents, but did not themselves define or effect the scope of the conveyance.**

OPP points to differences between the list (of entities) associated with the Notice of Transfer and the unsigned Schedule B page appearing with the signed Data Authorization. Obj. at 10–11. But the schedules, although required closing deliverables, neither redefine the Asset nor contain operative granting language limiting the transfer to the entities appearing on any list.

The schedules were included because they served an important evidentiary and administrative function: they requested the information needed to trace enterprise payment-card activity across Buffets' affiliated names, subsidiaries, former names, DBAs, merchant IDs, and TINs. The Authorization permitted Cascade to obtain all relevant data from any source and made the listed information illustrative, not exhaustive.

The two additional entries OPP identifies do not establish that independent claims were added in 2023. HRE Mountain Management Group shares the TIN listed for Fire Mountain Management Group, and "Rijffets, Inc." shares Buffets, Inc.'s TIN. Obj. at 10–11; Obj., Ex. 2. The discrepancy appears consistent with aliases, data variants, or duplicate references; it is not proof that the sale itself was reconstructed.

More fundamentally, the Report's ownership determination rests on the operative transaction documents, including the APA, Notice of Assignment, and signed Authorization to

CLARKHILL\105068\1014633\288800351.v1-7/22/26

Obtain Transactional Data. OPP's challenge to the provenance of one supporting schedule does not undermine that operative language.

**C.    OPP's affiliate argument raises, at most, entity-specific authority questions; it does not confine the transaction to Buffets, Inc.'s formal name.**

OPP argues that Buffets, Inc. could not convey assets owned by legally distinct parents or subsidiaries. Obj. at 16–18. The general principle that one corporation does not own another corporation's assets is not disputed. But it does not resolve two separate questions: the intended scope of this transaction and whether Buffets possessed or exercised authority to convey a particular entity's rights. The 2013 documents demonstrate the intended transactional scope. They contemplated payment-card activity under affiliated corporate names, subsidiaries, former names, and DBAs, and authorized collection of the associated transactional data. The APA also contains representations concerning Buffets' authority and title. That evidence shows that the transaction was not drafted as a sale confined to activity booked solely under Buffets, Inc.'s formal name.

OPP's corporate-separateness authorities establish that stock ownership alone does not convey a subsidiary's assets. See Obj. at 17. They do not establish that every TIN or historical merchant name represented a separately owned cause of action, and they do not address mergers, dissolutions, succession, agency, centralized claims administration, or other transaction-specific sources of authority. The issue therefore must be evaluated entity by entity, not resolved categorically from the Buffets, Inc. signature line.

OPP's Exhibit B narrows the issue further by identifying Big R Procurement Co., Fire Mountain Management Group, Ryan's Restaurant Management Group, and Distinctive Dining as predecessor entities that had merged or dissolved before the relevant period. Obj., Ex. B. Rights associated with those entities turn on their successors, not on the absence of signatures from entities that no longer existed. At most, OPP identifies an entity-specific scope or authority issue; it does

CLARKHILL\105068\1014633\288800351.v1-7/22/26

not establish that the transaction as a whole failed or was categorically confined to Buffets, Inc.'s separately booked activity. The Report considered the documents and succession evidence together and concluded that the Buffets–Cascade APA transferred the Buffets Entities' MDL claims. Report at 8–9, 21.

**D.    Cascade conveyed to BSH the same Asset it had acquired from Buffets.**

There is little dispute concerning the final link in BSH's chain. On July 3, 2013, Cascade transferred to BSH the Asset it had acquired from Buffets. Cascade–BSH OSA, Recital A & § 2.1; Report at 9 (citing BSH's May 14, 2026 submission, Ex. A). As the Special Master observed, although the parties contested the scope of the Asset Buffets transferred to Cascade, "there appears to be no disagreement that Cascade sold that same Asset to BSH." Report at 9. OPP identifies no defect in the Cascade–BSH transaction and does not contend that Cascade retained ownership of any portion of the purchased Asset. The question is what Cascade acquired from Buffets. If the Court agrees with the Report that the Buffets–Cascade documents conveyed the MDL recovery, BSH's title follows under the next day's transfer. Report at 21. The Court should adopt that recommendation.

**VII.    THE REPORT CORRECTLY REJECTS OPP'S ALTERNATIVE THEORIES BASED ON LATER TRANSACTIONS AND BANKRUPTCIES**

OPP's remaining theories arise only if some rights survived the 2013 conveyance. It contends that later payment-card transactions created new claims belonging to the 2016 or 2021 debtors and that the later trusts conveyed them through residual-asset agreements. The Report rejected that chain. Having found that the MDL recovery was sold in 2013, the Special Master correctly concluded that the Buffets Entities no longer owned MDL claims when the later petitions were filed. Report at 20–21. OPP assumes that subsequent transaction data necessarily created separately owned causes of action; it does not establish that proposition.

**A.    OPP does not establish that later payment-card transactions created distinct causes of action owned by the later debtors.**

OPP contends that the 2013 transaction could not convey MDL damages attributable to payment-card transactions occurring after the sale, particularly transactions occurring after the commencement of the 2016 or 2021 bankruptcy cases. Obj. at 18–20. But that argument assumes the answer to the essential question: whether each later payment-card transaction generated a new and independently owned cause of action, or instead supplied additional data bearing upon the value of the contingent recovery already sold. Here, the Asset was a contingent recovery arising from identified litigation, with an amount the parties acknowledged could not yet be determined. The APA's continuing cooperation and data provisions are consistent with later information affecting administration or valuation of the transferred Recovery; they do not establish that each later transaction necessarily created a new legal claim.

BSH need not establish, as an abstract proposition, that every later payment-card transaction merely affected valuation. OPP's competing chain depends on the existence of distinct later-created rights, so OPP must identify and trace them. It does not identify a particular claim, its elements or accrual date, how it is severable from the assigned Recovery, or settlement language treating each later transaction as a separately accruing cause of action. It simply equates later damages data with later ownership. The Report tied its conclusion to the chain of title before it: the MDL claims vested in the Reorganized Debtors and were conveyed in 2013; OPP did not establish a distinct later-created asset belonging to a subsequent estate. Report at 20–21. OPP's unsubstantiated accrual assumption does not establish error.

**B.    Sections 541 and 363 do not place previously conveyed property into a later bankruptcy estate.**

OPP's bankruptcy-law argument again assumes ownership. Section 541(a)(1) includes in the estate "all legal or equitable interests of the debtor in property as of the commencement of the

23

case." Section 363(b)(1), in turn, authorizes the trustee to use, sell, or lease "property of the estate" outside the ordinary course after notice and a hearing. Neither provision gives the estate an interest the debtor did not possess at filing. See 11 U.S.C. §§ 541(a)(1), 363(b)(1); *In re Howard's Appliance Corp.*, 874 F.2d 88, 93 (2d Cir. 1989). A 2013 agreement of course could not sell property first owned by a future estate. But OPP must first show that a distinct property interest later arose in and belonged to a 2016 or 2021 debtor. Its § 363 argument assumes that premise rather than proving it.

**C.      The later trusts could convey only assets actually owned by the debtors and trusts.**

OPP places substantial weight on the breadth of the residual- and remnant-asset definitions in its later agreements. Obj. at 20–22. But those agreements cannot substitute for proof that the selling trusts owned the MDL claims. Each agreement was limited to property of the relevant trust "remaining" at sale, not previously sold, assigned, or transferred, and conveyed only the seller's existing right, title, and interest. OPP APA 1 therefore reached only assets the 2012 Litigation Trust received and retained; OPP APA 3 only assets that passed to and remained in the Unsecured Creditors Trust; and OPP APA 2 only assets that passed to and remained in the Liquidating Trust.

The Special Master concluded that none of those trusts received the MDL claims. The Litigation Trust did not receive them because they were not Transferred Avoidance Actions. The later trusts did not receive them because the Buffets Entities had conveyed the disputed recovery in 2013. Report at 20–21. A catch-all conveyance may protect a purchaser against an omitted description of an asset owned by the seller. However, such a conveyance cannot resurrect, as here, property the debtor sold years before its bankruptcy or create title in a trust whose governing plan never transferred the property to it.

**D.      OPP's own agreements underscore the limitations in its asserted chain of title.**

The agreements also illustrate the limitations in OPP's theory. They repeatedly limit each sale to the trust's existing interest in assets remaining and not previously transferred, on an "as is, where is" basis. OPP thus assumed the risk that a broadly described category contained no asset owned by the seller. OPP APA 2 further illustrates the difficulty with OPP's characterization. It excludes claims and related proceeds held pursuant to §§ 510, 542, 543, 544, 547, 548, 549, 550, and 553. Obj., Ex. 6 at 1. Yet OPP invokes the § 542 label to place the MDL rights in the 2012 Litigation Trust, while treating them as included antitrust residual assets under a later agreement that excludes claims held pursuant to § 542 and their proceeds.

OPP APA 2 does not control the meaning of the 2012 Plan, and its exclusion is not independently dispositive. It does, however, underscore why the classification cannot shift from one link in OPP's chain to the next. The coherent reading adopted in the Report is that the disputed rights are antitrust claims that vested in the Reorganized Debtors and were conveyed through the 2013 transactions. The Report recommends that the Court find that the later trusts neither owned nor conveyed the MDL claims to OPP. The Court should adopt those recommendations.

## VIII.   OPP'S ALTERNATIVE REQUEST FOR DISCOVERY OR FURTHER SPECIAL-MASTER PROCEEDINGS SHOULD BE DENIED

OPP alternatively asks the Court to resubmit the matter with instructions to permit discovery concerning the unsigned Schedule B page appearing after the signed Data Authorization. Obj. at 18. The request should be denied. The Revised Special Master Order established a limited claims-dispute process and directed the Special Master to issue reports and recommendations; OPP concedes that the order did not authorize discovery. Revised Special Master Order ¶ 1; Obj. at 18. This was not an ordinary civil action followed by post-recommendation discovery.

OPP participated fully, submitted its chain-of-title documents, and had the opportunity to raise perceived evidentiary deficiencies before the Report issued. BSH submitted the signed Data

CLARKHILL\105068\1014633\288800351.v1-7/22/26

Authorization and accompanying page on May 15, 2026, nearly four weeks before the June 10 Report. OPP received the submission but did not ask the Special Master to defer his recommendation, require authentication evidence, permit targeted discovery, or hold a further conference. Obj. at 10, 18; Report at 5.

The request is also nonspecific. OPP identifies no witness, custodian, known document, proposed request, or concrete evidence likely to change the result. Its observations concern the dimensions and provenance of an unsigned Schedule B page—not the signatures or operative text of the APA, Notice, or Data Authorization—and do not justify open-ended discovery into a 2013 transaction.

More fundamentally, the proposed discovery would not affect the Report's principal legal conclusions. Schedule B's provenance does not alter the Plan's definition of Transferred Avoidance Actions, convert antitrust claims into § 542 claims, or expand the property held by later trusts. And the APA, Notice, and signed Data Authorization—not Schedule B alone—contain the operative language establishing the conveyance of the contingent Recovery.

Rule 53(f)(1) permits the Court to receive evidence or resubmit a matter; it does not import the Rule 56(d) procedure OPP invokes by analogy. Rule 56(d) applies when a summary-judgment nonmovant shows "by affidavit or declaration" that, "for specified reasons," it cannot present essential facts. Fed. R. Civ. P. 56(d). Even under that framework, the submission must identify the discovery sought, how the expected facts would create a genuine issue, the efforts made to obtain them, and why those efforts failed. *Paddington Partners v. Bouchard*, 34 F.3d 1132, 1138 (2d Cir. 1994). This is not a summary-judgment motion, and OPP supplies no comparable sworn or particularized showing. It has shown neither procedural unfairness nor specific new evidence

likely to alter the Report. The Court should deny the request and adopt the Report without further proceedings.

## IX.   CONCLUSION

For the foregoing reasons, BSH respectfully requests that the Court overrule OPP's Objection, deny its alternative request for discovery or resubmission, and adopt the Special Master's Report and Recommendation in full.

DATED:  July 22, 2026

Respectfully submitted,

CLARK HILL LLP

By: _____
Blair Will, Esq.
505 Montgomery Street, 13th Floor
San Francisco, CA 94111
(415) 984-8500
Attorneys for Claimant, Blue Sturgeon Holdings, LLC

CLARKHILL\105068\1014633\288800351.v1-7/22/26

## CERTIFICATE OF COMPLIANCE

I certify that the accompanying Opposition to Oak Point Partners, LLC's Objection to the Special Master's Report and Recommendation complies with the word count limitation set forth in Local Civil Rule 7.1(c).

Prepared using Microsoft Word, this document contains 7032 words, excluding those portions exempted by Local Civil Rule 7.1(c).

Executed on this 22nd day of July, 2026, in San Francisco, California.

_____
    Blair Will, Esq.

CLARKHILL\105068\1014633\288800351.v1-7/22/26